UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CURTIS YOUNG | CIVIL ACTION NO: 18-4464 |
| VERSUS | DISTRICT JUDGE<br>HON. JAY C. ZAINEY |
| FREEPORT-MCMORAN OIL & GAS, LLC,<br>OFFSHORE MARINE CONTRACTORS, INC.,<br>AND L/B JAMIE G. EYMARD | MAGISTRATE JUDGE<br>HON. JOSEPH C. WILKINSON, JR. |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
SUBMITTED ON BEHALF OF DEFENDANT, OFFSHORE MARINE CONTRACTORS, INC.**

Defendant, Offshore Marine Contractors, Inc. ("OMC"), requests the Court to make the following findings of fact and conclusions of law as part of the Court's decision. To the extent necessary and in the Court's discretion, any of the proposed Findings of Fact that constitute Conclusions of Law are to be adopted as Conclusions of Law and any of the proposed Conclusions of Law that constitute Findings of Fact are to be adopted as Findings of Fact.

## FINDINGS OF FACT

1. At the time of trial, plaintiff Curtis Young had been employed off and on by OMC for roughly 16 years, intermittently from 2003 until trial in 2019.[1]

2. Mr. Young was trained as an able-bodied seaman, and thus proficient in the standards for watchkeeping as an Able-Bodied Seaman.[2]

3. My. Young lost his mariner's license and able-bodied seaman endorsement due to his failing a drug test. Because of this he was working at a lower rank, that of Ordinary Seaman, on the date of the alleged incident.[3]

4. After having his license reinstated (but not his A/B endorsement), Mr. Young applied for re-hire with OMC in 2013 and on September 17, 2013 in connection with that rehire

---

[1] Exhibit 13, Bates Page 0324; Trial Testimony of Curtis Young
[2] Exhibit 13, Bates Page 0330.
[3] Trial Testimony of Curtis Young.

application, Mr. Young filled out a medical questionnaire where he affirmatively denied any pre-existing back pain.[4]

5. On re-hire in 2013 Mr. Young failed to disclose to OMC that he had treated with Dr. Aparna Vellanki in 2010 for what the medical records refer to as "*chronic back pain with acute exacerbation*."[5]

6. Mr. Young was an experienced seaman and experienced at working on liftboats.

7. After his rehire in 2013, Mr. Young worked for OMC as an ordinary seaman from 2013 through 2014 without known incident.

8. However, in December of 2014, while on board the L/B Lucas Bourg, a vessel in OMC's fleet, Mr. Young requested a payroll deduction for "Aleve 100 Caplets" which were provided to him by OMC at his request.[6]

9. OMC routinely stocks Aspirin and Ibuprofen (Advil) on its vessels but nothing stronger.[7]

10. Mr. Young claimed at trial that the request for Aleve was because of a toothache; however, Medical Records from Ochsner Medical Center show that on January 5, 2015 he sought treatment in the emergency room for back pain.[8]

11. At trial Mr. Young testified that he clearly remembered that visit, that he saw Dr. Jose Cusco, and that the medical records were incorrect about his complaints; however, the Court does not credit this testimony as at trial his testimony was impeached. The records reflect that he did not see Dr. Cusco until years later and on January 5, 2015 he actually saw Dr. Ruth Ellen Foster.[9]

12. Mr. Young reported to Dr. Foster on January 5, 2015 that his back pain was a recurrent problem that started several weeks ago and occurs daily. He reported that the pain is associated with lifting heavy objects.

13. At trial Mr. Young tried to characterize the treatment sought as not being back related; however, the Court does not credit his testimony that he complained of pain in his side, as he recalled at trial, because It conflicts with the contemporaneous records, and with the records of Mr. Young's other physicians, and their testimony.

14. Mr. Young did not report this condition to his then employer, OMC.

---

[4] Exhibit 13, Page 0345; Trial Testimony of Curtis Young.
[5] Exhibit 11, Bates Page 0274.
[6] Exhibit 13, Bates Page 0349.
[7] Trial Testimony of Ronnie Boudreaux and Mitch Orgeron.
[8] Exhibit 20, Bates Page 0709.
[9] Ibid; Trial Testimony of Curtis Young.

15. Mr. Young treated with Dr. Anu Vellanki on January 6, 2015, the next day, and again complained of low back pain, with a self-reported severity level of 10/10. The records from St. James Primary Care reflect that My Young again characterized it as a chronic problem with an acute exacerbation.[10]

16. These complaints of severe back pain pre-dated his later re-hire with OMC by roughly eight (8) months and pre-dated his alleged incident by roughly 19 months.

17. The Court does not credit Mr. Young's testimony at trial that he told Dr. Vellanki his pain was in his side, or that it was "5/10" with regard to pain as this conflicts with the medical records made at the time of the visit.

18. Dr. Vellanki prescribed Norco to Mr. Young: 45 pills with no refills. He also prescribed Robaxin, a muscle relaxer that may cause sedation: 30 pills with two refills.[11]

19. Mr. Young returned to the L/B LUCAS BOURG that same day: January 6, 2019 and signed a certification that he was fit for duty.[12]

20. Mr. Young signed an OMC certification, certifying that he was able to work and that he did not have any medications with him on the vessel.[13] The Court does not credit Mr. Young's testimony that he would not take his muscle relaxers or pain pills on the vessel because Mr. Young repeatedly filled prescriptions before getting on the vessel and it does not follow that he would fill the prescriptions then not take them.

21. The next time Mr. Young was off hitch was January 21, 2015, and on January 28, 2015, he returned to Dr. Vellanki with the same complaints. also recommended physical therapy to Mr. Young, and he recommended that Mr. Young see an orthopedist and seek physical therapy. Dr. Vellanki prescribed Mr. Young 60 tramadol to be taken twice a day with two refills, and 45 cyclobenzaprine, a muscle relaxer, with another two refills. This is an aggregate 90-day supply of pain medication and muscle relaxers [14]

22. Mr. Young worked until February 18, 2015.

23. On February 24, Mr. Young saw an orthopedic surgeon, Dr. Chad Loup. He again complained of lower back pain. He was recommended physical therapy and an MRI, and he was prescribed more medication. He filled the prescription, but he did not get the MRI or attend physical therapy. Instead, he returned to work.[15]

---

[10] Exhibit 11, Bates Page 0271.
[11] Exhibit 11, Bates Page 0272.
[12] Exhibit 19, Bates Page 0685; Exhibit 27.
[13] Exhibit 27; Testimony of Curtis Young.
[14] Exhibit 11.
[15] Exhibits 18, Bates Page 0686; Exhibit 12 (Medical Records, Dr. Chad Loup).

24. Mr. Young never reported to OMC that he had seen an orthopedic surgeon for back complaints. [16]

25. On March 24, while off hitch, Mr. Young went to the Willis Knighton emergency room with the same complaints of back pain he had seen Dr. Loup and Dr. Vellanki for. He again obtained a prescription for narcotic pain medication.[17]

26. Mr. Young did not disclose to the emergency room physician at Willis-Knighton Medical Center that he had the ability to obtain Tramadol and Cyclobenzaprine.

27. Mr. Young left OMC's employment on May 31, 2015 for another job with Boise Cascade where he was subsequently terminated.

28. He re-applied at OMC and he was conditionally re-hired on July 28, 2015.

29. On July 28, 2015 Mr. Young filled out another medical questionnaire in which he admitted that he had high blood pressure, but he denied that he had back pain. [18]

30. Shown by the months of consistent treatment starting in January 2015, Mr. Young had significant, ongoing back pain, which he concealed from OMC. Mr. Young admitted at trial that he knew he would not have been hired had he disclosed this.[19]

31. The very day after being hired back at OMC, Mr. Young saw Dr. Vellanki again, and he complained of radiating pain into his legs.[20]

32. Again, in September and December of 2015, and then in January, February, April, June, and July of 2015, Mr. Young saw Dr. Vellanki with the same complaints of pain in the lower back and received the same treatment: muscle relaxers and opiate pain pills.[21]

33. Mr. Young claims a ladder fell and hit him on August 29, 2016 at around 1:30 in the morning, as a result of high winds while the L/B OLIVIA GRACE was jacked.

34. Mr. Young does not recall which ladder hit him, or how it was stored. [22]

35. There were no witnesses to the ladder falling on Mr. Young as alleged.

36. As a seaman standing watch. Mr. Young was responsible for ensuring the ladders were secured.

---

[16] Trial Testimony of Mitch Orgeron.
[17] Exhibit 21, Bates Page 0945; Trial Testimony of Curtis Young.
[18] Exhibit 13, Bates Page 0428.
[19] Trial Testimony of Curtis Young.
[20] Exhibit 11, Bates Page 0265.
[21] Exhibit 11.
[22] Trial Testimony of Curtis Young.

37. Mr. Young assumed the watch at 1800 hours on August 28 while the L/B OLIVIA GRACE was in transit. When a deckhand takes watch while the vessel is in transit, it is his obligation ensure everything is secured properly – this would include the ladder that allegedly hit him later that evening. [23]

38. Mr. Young disagrees with the vessel logs in this regard, and he claims he did not take watch while the vessel was in transit. The Court finds the credible evidence is the vessel logs, which were created contemporaneously showing that Mr. Young did assume the watch while the vessel was in transit as OMC alleges.

39. Mr. Young instead claims he spent the entire time, from 1800 hours on the 28th until 0130 hours on the 29th, in the engine room, but the Court does not find this testimony credible because there was no reason for Mr. Young to be in the engine room, which would have been loud and hot. There was no Job Safety Analysis (JSA) done on August 29, 2015 for any work in the engine room.

40. Mr. Young claims that after the ladder fell on him, he re-secured the ladder, and because he did not think he had been hurt, he did not report an accident. This violated OMC's accident reporting rules, which required Mr. Young to report any accident or near miss, whether it caused injury or not.

41. Mr. Young did not report any injury for three (3) days.

42. The next morning, Mr. Young was involved in torqueing the planetaries, which is a two-person job. One person holds the ladder, while the other climbs the ladder with a large, heavy torque wrench to tighten the nuts on the planetaries. This is one of the more strenuous jobs on the vessel. It also involves a Job Safety Analysis, which Mr. Young participated in. [24]

43. At no point did he mention to anyone on board the vessel that one of the ladders was improperly secured and had fallen on him, though he claims now the ladder had fallen on him the day before. [25]

44. Mr. Young claims both the vessel logs and the JSA are inaccurate, and that the planetaries were not torqued on September 29, 2016. The Court does not credit this testimony because it conflicts with the contemporaneous records. The JSAs from August 29, 2015 establish that Mr. Young and Shawn Watkins torqued the planetaries on the evening of August 29, 2015. [26]

45. Mr. Young reported the alleged accident on September 1, 2016 to his captain. He reported that a ladder had fallen on him. Mr. Young was placed on light duty until September 5, 2016, when a crew boat came in and took him into shore.

---

[23] Exhibit 18, Bates Page 0635.
[24] Trial testimony of Shawn Watkins, Ronnie Boudreaux.
[25] Trial testimony of Ronnie Boudreaux, Shawn Watkins, Mitch Orgeron, and Curtis Young.
[26] Exhibit 29, Bates Page 1131; Trial Testimony of Shawn Watkins.

46. Mr. Young did not report the incident to his captain, Ronnie Boudreaux, until after he was tasked again with torqueing the planetaries.

47. In a handwritten note Mr. Young admitted to taking narcotic pain medication with him on board the vessel.[27]

48. Mr. Young testified that he took Hydrocodone and cyclobenzaprine on board the vessel and further admitted that he placed the medication in a vitamin bottle.[28]

49. Mr. Young claimed that he took his pain medication on the trip from the dock to the doctor, but he did not test positive when he took a drug test at Complete Occupational Health.

50. Because of the fact that Mr. Young had a prescription for opioids, even if he had these drugs in his system, he would not have "failed" his drug test. The presence of validly prescribed prescription medication will not be reported as a failure.[29]

51. On September 6, 2016, Mr. Young saw Dr. Vellanki again. He reported the same exact complaints of back pain to Dr. Vellanki on that day that he reported in the months leading up to the alleged incident.

52. On his first visit to Dr. Vellanki after the incident, he did not say anything about a ladder falling on him.[30]

53. Mr. Young returned to Dr. Vellanki in October of 2016, after he had seen Dr. Zoran Cupic, referred by his attorney. At this time, he did reference a ladder falling on him, but he said it happened in late September, not in late August, getting the date wrong by almost a month.[31]

54. Mr. Young told Dr. Cupic that at the time of his accident, he had some intermittent back pain, but it was resolving.

55. Mr. Young testified at trial that he never told any doctor he had back pain. He said instead that he had pain in his side. The Court does not credit this testimony. Every doctor Mr. Young saw referenced back pain, not side pain.

---

[27] Exhibit 19, Bates Page 0704.
[28] Trial Testimony of Curtis Young.
[29] Trial Testimony of Mitch Orgeron.
[30] Exhibit 11, Bates Page 0243.
[31] Exhibit 11, Bates Page 0240.

## **CONCLUSIONS OF LAW**

**Jones Act**

1. The Jones Act creates a cause of action for negligence when a seaman is injured in the course of his employment. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416 (2009).

2. "An employer is liable under the Jones Act if the negligence of its employees played any part, even the slightest in causing the injury or death for which damages are sought." Even so, the Fifth Circuit clarified that the employer's standard of care is not greater than that of ordinary negligence under the circumstances. A Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of an injury does not establish liability. *Stowe v. Moran Towing Corp.*, 995 F. Supp. 2d 570, 575 (E.D. La. 2014)

3. A Jones Act employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear. *Fluker v. Manson Gulf, LLC*, 193 F. Supp. 3d 668, 674 (E.D. La. 2016)

4. At all material times, OMC was Mr. Young's Jones Act employer.

5. 65. "Contributory negligence is an affirmative defense that diminishes recovery in proportion to the seaman's fault. To establish that a seaman is contributorily negligent, an employer must prove negligence and causation." *Id.*

6. Under the Jones Act, the reasonable person standard is one of a reasonable seaman in like circumstances. *Id.* "To establish causation, an employer must show that a seaman's negligence played any part, even the slightest, in producing the injury." *Id.*

7. Mr. Young did not prove OMC was negligent because he did not offer credible evidence to establish that the ladder was improperly stored or that any employee of OMC or OMC itself was in any way negligent. He did not recall who had last stored the ladder, which ladder fell on him, or how it was secured.

8. Mr. Young has failed to establish by a preponderance of the evidence that any act or omission on the part of OMC or anyone for whom it is responsible caused any injury to him.

9. The Court concludes that Mr. Young's back problems both before and after the alleged were identical.

10. If a ladder fell on Mr. Young, he was comparatively negligent for failure to secure it.

11. Fault is apportioned 100% to Mr. Young.

**Unseaworthiness**

1. "Independent from a claim under the Jones Act, a seaman has a claim for injuries caused by the unseaworthiness of a vessel under general maritime law. The duty of a vessel owner to provide a seaworthy vessel is an absolute non-delegable duty; the duty imposes liability without fault." *Fluker*, 2016 WL 3346038, at *4.

2. "Unseaworthiness is not a fault-based standard; a plaintiff must show, however, that the unseaworthy condition `played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Id.* (quoting *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992)).

3. "A vessel is unseaworthy only if it presents an unreasonable risk of harm to the seaman. The owner is not obligated to furnish an `accident-free' ship. Seaworthiness requires only that a vessel and its appurtenances be reasonably suited for its intended purpose or use." *Patterson v. Omega Protein, Inc.*, 26 F. Supp. 3d 544, 547-48 (E.D. La. 2014) (internal quotations and citations omitted).

4. "[A]n unsafe method of work may render a vessel unseaworthy." *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 303 (5th Cir. 1985). However, "[t]he mere existence of an alternative method of work or of alternative equipment . . . is insufficient of itself to render a vessel unseaworthy." *Id.*

5. Mr. Young did not prove that the M/V JAMIE EYMARD was unseaworthy.

**Maintenance and Cure**

1. A seaman who becomes sick or injured during his service to the ship is entitled to maintenance and cure. *Cooper v. Diamond M Co.,* 799 F.2d 176, 178-79 (5th Cir. 1986) (citations omitted).

2. "`Maintenance' encompasses a seaman's living expenses, while `cure' covers payment of medical or therapeutic treatment." *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir. 1979) (citations omitted).

3. "Maintenance and cure must be paid by the seaman's employer until the point of `maximum medical recovery' or `maximum cure.' Maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition, a determination that would be appropriate if the seaman's injury is incurable or future treatment would merely relieve pain and suffering but not otherwise improve the seaman's physical condition." *Alario v. Offshore Serv. Vessels, L.L.C.,* 477 F. App'x 186, 188 (5th Cir. 2012) (internal quotations omitted).

4. Where a ship owner requires a seaman to submit to a pre-hiring medical examination or interview, and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then the seaman is not entitled to an award of maintenance and cure. *McCorpen v. Central Gulf Steamship Corp.,* 396 F.2d 547, 559 (5th Cir. 1968). The seaman has a duty, under *McCorpen,* to disclose past injuries if asked. *Guillory v. Northbank Towing Corp.,* 92-14, 1993 WL 721991, at *2 (W.D. La. June 25, 1993). In order to prevail on its *McCorpen* defense, an employer must show that:

   (1) the claimant intentionally misrepresented or concealed medical facts;
   (2) the non-disclosed facts were material to the employer's decision to hire the claimant; and
   (3) a connection exists between the withheld information and the injury complained of in the lawsuit.

   *Brown v. Parker Drilling Offshore Corp.,* 410 F.3d 166, 171 (5th Cir. 2005).

5. The "intentional concealment" prong of *McCorpen* is essentially an objective inquiry and does not require a finding of subjective intent.

6. Failure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information therefore satisfies the "intentional concealment" requirement. *Id.* at 174-75.

7. Mr. Young failed to disclose his prior medical condition when he denied any previous problems with his back, neck or shoulders in response to specific questions on his employment application and also when he filled out the medical questionnaire in connection with his pre-employment physical examination.

8. His testimony that he did not have any back problems, only problems with his side, is not credible. The first element of the *McCorpen* defense is established.

9. The second element of the *McCorpen* defense, materiality, was also clearly established at trial. The fact that an employer asks a specific question regarding past medical history on an employment application, and that question is rationally related to the applicant's physical ability to perform his job duties, renders the information material for purposes of this analysis. *Id.*

10. Mr. Young applied for the position of deckhand, obviously a heavy manual job. He knew that as he had worked as a deckhand before, for some time. The questions about whether he had experienced previous back or neck problems were clearly related to his ability to perform this manual labor. By denying any previous problems, Mr. Young denied his employer the opportunity to further investigate and assess his physical condition in order to decide whether to hire him.

11. The third prong of *McCorpen* is causality, that is, whether there is a connection between the withheld information and the injury which the claimant sustained. Under the causal relationship prong, the present injury need not be identical to a previous injury. All that is required is a causal link between the pre-existing condition or injury and the injury that occurred during the claimant's employment. The test applied is not a causation analysis in the ordinary sense, and the employer need only prove that the old injury and the new injury affected the same body part. *Wilkerson v. Loupe Construction and Consulting Co., Inc.,* 11-676, 2011 WL 4947604, at *4 (E.D. La. Oct. 18, 2011) (citing *Brown,* 410 F.3d at 176).

12. Mr. Young failed to disclose his lengthy treatment for lower back pain. His current injury to his lower back is clearly causally related or connected to the same part of his body. The third and final element of *McCorpen* is met.

13. For these reasons, the Court finds that the *McCorpen* defense has been established by OMC. Mr. Young forfeited his right to claim maintenance and cure.

Respectfully submitted:

**BOHMAN | MORSE LLC**

/s/Martin S. Bohman
MARTIN S. BOHMAN T/A (#22005)
HARRY E. MORSE (#31515)
650 Poydras Street, Suite 2710
New Orleans, LA  70130
Telephone: (504) 930-4009
E-Mail: martin@bohmanmorse.com
E-Mail: harry@bohmanmorse.com

*Attorneys For Offshore Marine Contractors, Inc., Freeport-McMoRan Oil and Gas, LLC, and the L/B Jamie G. Eymard, in rem.*